Judge Barbara Jacobs Rothstein



FILED
LODGED
ENTERED
RECEIVED

DEC 1 1 2002

CLERK U.S. DISTRICT COURT
BY WESTERN DISTRICT OF WASHINGTON AT SEATTLE
DEPUTY

CR 01-00338 #00000197

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,       )
                                )   NO. CR01-338R
                Plaintiff,       )
                                )
        v.                      )   PLEA AGREEMENT
                                )
OLYMPIC PIPE LINE COMPANY,      )
                                )
                Defendant.       )
_____)

The United States of America, by and through John McKay, United States

Attorney for the Western District of Washington, Lawrence Lincoln, Francis J. Diskin,

and Helen J. Brunner, Assistant United States Attorneys for said District, and

James D. Oesterle, Special Assistant United States Attorney, and the defendant,

OLYMPIC PIPE LINE COMPANY, (hereinafter "OLYMPIC"), through its attorneys,

Yarmuth Wilsdon Calfo PLLC and Danielson Harrigan Tollefson LLP, hereby enter into

the following Agreement, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C):

1.   The Charges.  OLYMPIC having been advised of the right to have this

matter tried before a jury, agrees to waive that right and enter pleas of guilty to the

following charges:

a.   Count 2 of the Indictment charging OLYMPIC with

negligently causing the discharge of a harmful quantity of gasoline into a navigable water

of the United States on June 10, 1999, in violation of the Federal Water Pollution Control

Act, Title 33, United States Code, Section 1319(c)(1)(A) and 1321(b)(3);

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903
(206) 553-7970

1          b.     <u>Count 6</u> of the Indictment charging OLYMPIC with knowingly and

2    willfully violating a minimum safety standard for interstate pipeline carrying hazardous

3    liquids relating to training, in violation of the Hazardous Liquid Pipeline Safety Act,

4    Title 49, United States Code, Section 60123(a); and

5          c.     <u>The Information</u> charging OLYMPIC with the unlawful discharge of

6    refuse matter into a navigable water and tributary of a navigable water of the United

7    States, in violation of Rivers and Harbors Act, Title 33, United States Code, Sections 407

8    and 411.

9          By entering its pleas of guilty, OLYMPIC hereby waives any and all objections to

10   the filed charges based on the form both of the charging Indictment and the charging

11   Information.

12         2.     <u>Elements of the Offense</u>.  OLYMPIC acknowledges that it is aware of the

13   nature and elements of the three offenses to which it is entering pleas of guilty.

14   Specifically, if this case were to proceed to trial, the United States would have the burden

15   of proving beyond a reasonable doubt the elements of the offenses as listed below:

16         a.     <u>Count 2</u> - - Title 33, United States Code, Sections 1319(c)(1)(A) and

17                1321(b)(3).

18                (1)    The defendant discharged or caused the discharge of oil or a
                         hazardous substance;
19
20                (2)    The amount of oil discharged was a quantity deemed to be
                         harmful by federal regulation;
21                (3)    The oil or hazardous substances was discharged
                         into a navigable water of the United States; and
22
                  (4)    The discharge was caused by the negligence of the defendant.
23
           b.     <u>Count 6</u> - - Title 49, United States Code, Section 60123(a).
24
25                (1)    The defendant owned or operated a pipeline facility used to
                         transport a hazardous liquid in a manner affecting interstate or
                         foreign commerce;
26
27                (2)    The defendant violated a training regulation prescribed for
                         such a pipeline facility, namely, 49 C.F.R. Sections 195.402
                         and 195.403; and
28
                  (3)    The defendant did so knowingly and willfully.

PLEA AGREEMENT/OLYMPIC PIPE LINE COMPANY - 2
CR01-338R

1    c.    Information - - Title 33, United States Code, Section 407 and 411.

2          (1)    The defendant discharged or caused the discharge of refuse matter, that is, gasoline;

3

4          (2)    The discharge was into a navigable water or tributary to a navigable water of the United States; and

5          (3)    The defendant did not have a permit for the discharge.

6    3.    The Penalties. OLYMPIC understands that the maximum statutory

7    penalties applicable to a corporate defendant for a violation of the Federal Water

8    Pollution Control Act as charged in Count 2 of the Indictment is a fine of Five Hundred

9    Thousand($500,000) Dollars, a term of probation of up to five (5) years, and a special

10   assessment of One Hundred Twenty-Five ($125.00) Dollars. OLYMPIC understands that

11   the maximum statutory penalties applicable to a corporate defendant for a violation of the

12   Hazardous Liquid Pipeline Safety Act, as charged in Count 6 of the Indictment is a fine of

13   Five Hundred Thousand ($500,000) Dollars, a term of probation of up to five (5) years,

14   and a special assessment of Four Hundred ($400) Dollars. OLYMPIC understands that

15   the maximum statutory penalties applicable to a corporate defendant for a violation of the

16   Rivers and Harbors Act, as charged in the Information, is fine of Five Hundred Thousand

17   ($500,000) Dollars, a term of probation of up to five (5) years, and a special assessment

18   of One Hundred Twenty-Five ($125.00) Dollars.

19         OLYMPIC further understands that, as to each count, it may be fined under the

20   Alternative Fines Provision set forth in Title 18, United States Code, Section 3571(d),

21   which provides: "If any person derives pecuniary gain from the offense, or if the offense

22   results in a pecuniary loss to a person other than the defendant, the defendant may be

23   fined not more than the greater of twice the gross gain or twice the gross loss unless

24   imposition of a fine under this subsection would unduly complicate or prolong the

25   sentencing process."

26   4.    Rights Waived by Pleading Guilty. By pleading guilty, OLYMPIC

27   knowingly and voluntarily waives the following rights:

28         a.    The right to plead not guilty, and to persist in a plea of not guilty;

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903
(206) 553-7970

1      b.    The right to a speedy and public trial before an impartial jury;

2      c.    The right to the effective assistance of counsel at trial;

3      d.    The right to be presumed innocent until guilt has been established at

4    trial, beyond a reasonable doubt;

5      e.    The right to confront and cross-examine witnesses against it at trial;

6      f.    The right to compel or subpoena witnesses to appear on its behalf at

7    trial; and

8      g.    The right to appeal a finding of guilt or any pretrial rulings.

9      5.    Applicability of Sentencing Guidelines.  OLYMPIC understands and

10   acknowledges that the United States Sentencing Guidelines promulgated by the United

11   States Sentencing Commission are applicable to the sentencing in this case, except that

12   pursuant to USSG §§ 8C2.1 and 8C2.10, the United States Sentencing Guidelines are not

13   applicable in determining the fine for an organization convicted of violating offenses that

14   fall within the scope of Chapter Two, Part Q of the United States Sentencing Guidelines.

15     6.    Sentencing Agreement.  Pursuant to Federal Rule of Criminal

16   Procedure 11(c)(1)(C), the United States and OLYMPIC agree that the sentence to be

17   imposed by the Court shall be as follows:

18     a.    Fine.  OLYMPIC shall pay a criminal fine in the amount of

19   Six Million Dollars ($6,000,000.00), which fine is due and payable as follows:

20   One Million Dollars ($1,000,000.00) shall be due and payable on the day of sentencing,

21   and One Million Dollars ($1,000,000.00) shall be due and payable every year thereafter

22   on the date of sentencing (or the next business date if the sentencing date falls on a

23   weekend or holiday) for five years.

24     b.    Mandatory Special Assessment.  OLYMPIC shall pay a special

25   assessment of One Hundred Twenty Five Dollars ($125.00) for Count 2, a special

26   assessment of Four Hundred Dollars ($400.00) for Count 6, and a special assessment of

27   One Hundred Twenty Five Dollars ($125.00) for the charge in the Information, for a total

28

1  for Six Hundred Fifty Dollars ($650.00), which assessments are due and payable

2  immediately.

3          c.    <u>Probation</u>. OLYMPIC will be placed on organizational probation for

4  a period of five years pursuant to USSG §§ 8D1.1 and 8D1.2. The terms of probation

5  shall include the following specific provisions in addition to the Court's standard

6  conditions:

7          (1)    <u>No Further Violations</u>. OLYMPIC shall commit no violations

8  of environmental or pipeline safety laws or regulations, including those laws and

9  regulations for which primary enforcement has been delegated to state authorities.

10  The United States Attorney's Office for the Western District of Washington will not

11  consider as a violation of probation, any Grade C violation that is minor, and not part of a

12  continuing pattern of violations, where such treatment will not present an undue risk to an

13  individual or the public or be inconsistent with any directive from the Court, within the

14  meaning of USSG § 7B1.2(b). For purposes of this section of this Agreement only, a

15  minor violation of the Clean Water Act that would otherwise be a Grade C violation

16  would not be considered a violation of probation solely by virtue of the last sentence of

17  33 U.S.C. § 1319(c)(1). The determination of whether the violation fits within this

18  category shall be within the reasonable discretion of the government, and in making this

19  determination, the government will provide the defendant company an opportunity to

20  present its position to the United States Attorney's Office. The government's position on

21  whether a subsequent violation is an appropriate basis for a probation violation does not

22  bind the United States Probation Office or the Court. Nothing herein shall prohibit the

23  United States from proceeding administratively, civilly, or criminally against defendant

24  company in any separate proceeding for any alleged environmental violation.

25          (2)    <u>Injunctive Relief</u>. OLYMPIC shall comply with the terms

26  and conditions of the consent decree to be entered by the Court in <u>United States of</u>

27  <u>America v. Shell Pipeline Company and Olympic Pipe Line Company</u>, CV02-1178R,

28  United States District Court for the Western District of Washington.

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903
(206) 553-7970

7.   <u>Application of the Agreement</u>.  This Agreement shall bind OLYMPIC and its successors and assigns.  OLYMPIC, or its successor-in-interest, if applicable, shall provide the United States Probation Office prompt notice of any name change, business reorganization, sale or purchase of assets, divestiture of assets, or similar action.

Olympic and the United States acknowledge that this plea agreement is made pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  If the Court rejects the sentencing recommendation contained in this plea agreement, and imposes a sentence other than that recommended by the parties, each party reserves the right to withdraw from this Agreement and proceed to trial.

8.   <u>Restitution</u>.  The parties agree, as part of this Rule 11(c)(1)(C) Plea Agreement, that the sentence appropriate in this matter shall not include restitution.  The United States submits that the issue of restitution for natural resource damage is being addressed through agreements with the State of Washington, the City of Bellingham, and third parties, and the issue of restitution for damages suffered by persons has been the subject of several civil actions, some of which have already concluded.

9.   <u>Statement of Facts</u>.  OLYMPIC and the United States agree that the following sets forth a sufficient factual basis for the offenses charged in Counts 2 and 6 of the Indictment and the offense charged in the Information:

## BACKGROUND

(1)   At all relevant times, Olympic Pipe Line Company ("Olympic") was a Delaware corporation with its principal place of business in Renton, Washington.  Olympic owns a 400-mile pipeline system that transports refined petroleum products, including gasoline, diesel and aviation fuel, from four refineries in Northern Washington State to various delivery facilities throughout Western Washington and in Portland, Oregon.

(2)   During most of the time period relevant to this case, Olympic's shares were owned by Texaco Trading and Transportation, Inc. ("TTTI"), Atlantic Richfield Company and GATX Terminal Corporation.  In 1998, TTTI's shares were transferred to Equilon Enterprises LLC, which was formed in 1998 as a result of an Agreement of Merger between subsidiaries of Texaco Inc. and Shell Oil Company (the "Merger").

(3)   At all relevant times, Equilon Pipeline Company LLC ("Equilon") was a Delaware limited liability company, with its principal place of business in Houston, Texas.  Equilon was a wholly-owned subsidiary of

PLEA AGREEMENT/OLYMPIC PIPE LINE COMPANY - 6
CR01-338R

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903
(206) 553-7970

Equilon Enterprises LLC, which was also organized in Delaware with its principal place of business in Houston, Texas.

(4)     On or about July 1, 1991, Olympic Pipe Line Company entered into an agreement with Texaco Pipeline Inc. ("TPLI"), a subsidiary of TTTI, to provide, among other things, management guidance, administrative services and management personnel to direct the day-to-day operations of the pipeline facilities under guidelines set forth by Olympic's Board of Directors. Olympic employees were designated under the same agreement to perform routine maintenance and operation of the system (the "Agreement"). In 1998, Equilon assumed the rights and obligations of TPLI under the Agreement as a result of the Merger. (The term "Equilon" shall hereinafter be used to refer to both Equilon and/or TPLI. The phrase "Olympic personnel" shall refer to Equilon employees assigned to assist Olympic and/or individuals directly employed by Olympic.)

(5)     Pursuant to the Agreement, between July 1991 and July 2000, Equilon employees assigned to work at Olympic included Olympic's President, Vice President and Manager, Operations Manager, Engineering Manager, Health, Safety and Environment Manager, and Business Development and Planning Manager. Equilon was paid a fee for providing management guidance, administrative services and managers under this Agreement.

(6)     At all times relevant, Olympic personnel used a computer system, commonly referred to as a Supervisory Control and Data Acquisition System ("SCADA"), to remotely operate the pipeline system from a control center located in Renton, Washington. Through the SCADA system, Olympic personnel were able to monitor pressures, temperatures, flows and other parameters within the pipeline system, and remotely operate and control pumping units, valves and other equipment in order to transport liquid petroleum products.

## FACTUAL BASIS SPECIFIC TO REFUSE ACT VIOLATION

(7)     On June 10, 1999, at Bellingham, Washington, at approximately 3:29 p.m., a rupture occurred on Olympic's pipeline near the Bellingham Water Treatment plant. As a result, approximately 160,000 gallons of gasoline was released from Olympic's pipeline into Hannah Creek, which is a tributary of Whatcom Creek, both of which are navigable waters of the United States. Olympic had not obtained a permit allowing for the discharge of this gasoline.

(8)     The origin point of the rupture of Olympic's line was in a gouge found near the top of the pipe. In 1994 and 1995, as part of a construction project, contractors working for the City of Bellingham installed a new pump station and new water lines in the area of the rupture. In that area, more than 20 scrapes and gouges appeared on the pipeline, consistent with strike marks made by construction equipment.

(9)     Olympic inspectors met with construction company personnel before and during the construction activity. At the request of Olympic inspectors, construction company representatives signed a document, entitled "Action Memo," whereby they agreed to comply with Olympic's General Right of Way Stipulations and Requirements, including a requirement to provide

1  Olympic with 48 hours prior notice of any grading or underground
crossings over the pipeline.

2

3  (10)   Olympic inspectors were not continuously at the project while all
construction activity took place. Neither the Olympic inspectors nor anyone
else at Olympic was notified of damage to the pipeline resulting from this

4  construction activity.

5  (11)   In 1991, Olympic's Board of Directors, at the recommendation of
TPLI, instituted a program to conduct internal line inspections of Olympic's

6  pipeline in segments such that the entire pipeline was inspected once every
five years.

7

8  (12)   In 1996, Olympic personnel hired a contractor to conduct an internal
line inspection of Olympic's pipeline segment from Ferndale to Allen,
Washington, the segment that runs through Bellingham. The inspection

9  tool used in 1996 was called a "magnetic flux" tool ("MFL Tool"), which is
designed to detect corrosion-related wall loss to the pipeline. After running

10  the MFL tool, the contractor provided Olympic a report identifying
anomalies in the area of the Water Treatment Plant. These anomalies were

11  identified as a "possible wrinkle bend," a "possible mash" and a
"mill/mechanical" defect involving wall loss of 23%. An Olympic

12  Engineering Assistant evaluated the anomalies in the area of the Bellingham
Water Treatment plant, and prepared a document entitled "Directions to Dig

13  Site." However, these anomalies were not excavated or visually inspected
in 1996.

14

15  (13)   In approximately January 1997, pursuant to an order issued by the
Washington State Department of Ecology following a pipeline leak in
June 1996, Olympic personnel contracted with another internal line

16  inspection company to perform a "caliper tool" inspection of Olympic's
pipeline. A caliper tool is designed to detect deformations in the

17  circumference of the pipe, such as dents. This contractor provided a report
to Olympic identifying a single anomaly in the area of the Water Treatment

18  Plant, identified as a ".45 sharp."

19  (14)   In 1997, after the caliper inspection tool was run, an Olympic
Engineering Assistant again evaluated the anomalies in the area of the

20  Bellingham Water Treatment Plant, and prepared a second dig sheet. This
document identified the four anomalies described by the two different

21  internal line inspections in the area of the Water Treatment Plant. The
Engineering Assistant provided this dig sheet to Olympic construction

22  personnel so that the anomalies could be inspected. However, Olympic
construction personnel reported to the Engineering Assistant that the area

23  could not be immediately inspected because the ground was too wet. The
Engineering Assistant thereafter consulted Olympic's Vice President and

24  Manager, who was assigned to work at Olympic by Equilon, regarding
whether to visually inspect the anomalies. The Engineering Assistant

25  recommended that no inspection take place, and the Vice President and
Manager agreed. In his notes explaining the decision not to inspect this

26  location, the Engineering Assistant concluded that the quantifiable
anomalies reported by the two internal inspections posed a "minimal risk"

27  and that the area where the anomalies existed was "difficult to access." As
a result, Olympic personnel did not excavate or inspect the anomalies in the

28  area of the Bellingham Water Treatment Plant.

PLEA AGREEMENT/OLYMPIC PIPE LINE COMPANY - 8
CR01-338R

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903
(206) 553-7970

(15)   In 1997, Olympic personnel contracted with an engineering firm to design and construct a products terminal on Olympic's line near the Skagit County Airport. This facility became known as the Bayview Products Terminal ("Bayview"). The piping within Bayview was rated to withstand pressure lower than that of Olympic's mainline pipe and, as a result, was designed to include safety devices that would control pressure within Bayview at pre-determined levels. Among these safety devices were control valves, relief valves and an inlet receiver valve. The inlet receiver valve was placed at the location where the Bayview products terminal received product from Olympic's mainline pipe originating in Ferndale, Washington. This receiver inlet valve was designed to close when pressure within the Bayview facility reached a pre-determined pressure.

(16)   Bayview was commissioned in December 1998 to receive and distribute product from Olympic's mainline pipeline originating from Ferndale. Thereafter, on 41 occasions between December 18, 1998, and June 10, 1999, the inlet receiver valve at Bayview closed when it reached its pre-determined closure set point. On the occasions that the inlet receiver valve closed prior to June 10, 1999, Olympic operations controllers were able to reduce pressure on the pipeline segment from Ferndale to Bayview by using controls on Olympic's SCADA system that shut down the pumps upstream of Bayview at Olympic's Ferndale pump station. The design of the Bayview facility, however, did not include a safety device that would act to reduce pressure upstream of Bayview if the inlet receiver valve closed and Olympic's SCADA system was not functioning.

(17)   On June 10, 1999, at approximately 3:10 p.m., Olympic's pipeline was transporting unleaded gasoline from a refinery upstream of Bayview to the Seattle area, and was being monitored by an Olympic operations controller named Kevin Dyvig. Another Olympic operations controller was also on duty, as was Olympic's Supervisor of Product Movement, Ronald Brentson, although Mr. Brenston was not in the control room during the events leading to the rupture on June 10, 1999.

(18)   At approximately 3:15 p.m. on June 10, 1999, the primary computer used by Olympic to monitor and control operations on the pipeline became slow and unresponsive, and effectively ceased to function. An effort was made to transfer control of the system to a backup computer, but this did not cure the slowdown. At about the time of this computer slowdown, an Olympic employee had been working on the SCADA computer system creating database records related to a pump station on the pipeline. Due to transient conditions in the pipeline at the time the computer slowdown occurred, pressure began to rise within the Bayview facility, leading to the closure of the Bayview receiver inlet valve.

(19)   Because of the problems with Olympic's computer system, Olympic's operations controllers were unable to shut down the pumping station upstream of Bayview from the Renton control room after the receiver inlet valve closed. As a result, pressure in this pipeline segment rose until approximately 3:29 p.m., at which time Olympic's pipeline burst near the Bellingham Water Treatment Plant and gasoline was discharged into Whatcom Creek.

## FACTUAL BASIS SPECIFIC TO COUNT TWO

(20)   On June 10, 1999, before and after the rupture occurred, Olympic

PLEA AGREEMENT/OLYMPIC PIPE LINE COMPANY - 9
CR01-338R

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903
(206) 553-7970

personnel worked to restore the functioning of the computer system. At approximately 3:48 p.m., it appeared to Olympic personnel that the computer system was again stable. However, during the computer slowdown, events occurring on the pipeline were not presented by the computer system to operations controllers. After the computer system appeared to stabilize, operations controller Kevin Dyvig conferred with his supervisor Ronald Brentson. Thereafter, he began to repressurize the pipeline segment between Ferndale and Bayview. A command to restart a pump at Olympic's Ferndale pump station was issued at 4:16 p.m. Olympic field personnel were not dispatched to the Bayview facility prior to Olympic's repressurization of the line.

(21)    Olympic had a Pipeline Leak Detection System ("PLDS") which monitored pipeline conditions by comparing data readings to a mathematical model of the pipeline. If the PLDS detects a difference between the actual condition of the pipeline and the expected condition of the pipeline, it gives an "alert." If the difference withstands additional computer analysis, it issues an "alarm." This PLDS system operated using data obtained through the SCADA system. It required a period of at least ten minutes to initialize or collect data on operating conditions before it was capable of issuing alarms or alerts.

(22)    After the initial rupture, this PLDS system did not issue an alert of a potential leak on Olympic's pipeline until approximately 4:29 p.m., about 13 minutes after Mr. Dyvig started repressurization of the pipeline and approximately 28 minutes after the SCADA system stabilized. After receiving this alert, Mr. Dyvig issued a command to start one more pump at the Ferndale station. Shortly thereafter, at approximately 4:32 pm., after low pressure alarms were received upstream and downstream of the rupture site, Mr. Dyvig initiated commands to close block valves on the pipeline segment that ruptured. At approximately 4:35 p.m., operations controllers received a telephone call indicating the existence of a strong odor of gasoline in the Bellingham area.

(23)    Olympic's repressurization of the pipeline after the initial rupture occurred over a 16-minute period. This repressurization caused an additional approximately 75,000 gallons of gasoline to flow through the rupture site. Olympic's negligence in continuing to repressure the pipeline during this time period caused the discharge of gasoline in a quantity that "may be harmful" as defined in applicable regulations.

## FACTUAL BASIS SPECIFIC TO COUNT SIX

(24)    At all relevant times, federal safety standards for interstate pipelines carrying hazardous liquids required pipeline operators to implement and document a continuing training program to instruct operating and maintenance personnel in carrying out the procedures in the operations manual relating to their assignments; knowing the characteristics of hazardous liquids; recognizing conditions likely to cause emergencies and taking appropriate corrective action related thereto; controlling accidental releases; using fire fighting equipment; and, for maintenance personnel, training in safely repairing facilities. Pipeline operators, at intervals not exceeding 15 months, but at least once each calendar year, were required to review with personnel their personal performance in meeting the objectives of the training program at least once each calendar years, and make appropriate changes to the training program.

PLEA AGREEMENT/OLYMPIC PIPE LINE COMPANY - 10
CR01-338R

1   (25)   Pursuant to this regulation, Olympic personnel had an obligation to
2   ascertain whether appropriate records were maintained documenting that, at
    intervals not exceeding 15 months but at least once each calendar year, the
    performance of control room operators in meeting the objectives of
3   Olympic's training program with respect to emergency response to a
    pipeline rupture was reviewed.  This would include documentation relating
4   to training performance reviews regarding the condition of a pipeline
    following an unscheduled shutdown.  Between approximately 1995 and
5   1998, Olympic personnel knowingly and willfully failed to comply with this
    regulatory provision in violation of 49 C.F.R. § 195.402, 40 C.F.R.
6   § 195.403(b) and Title 49, United States Code, Section 60123(a).  It is not
    contended that this conduct was the cause of the pipeline rupture and
7   subsequent releases of gasoline on June 10, 1999.

8   10.   <u>Non-Prosecution of Additional Offenses</u>.  The United States agrees to move

9   to dismiss the remaining counts in the Indictment at the time of sentencing and not to

10  prosecute OLYMPIC in the Western District of Washington for any additional offenses

11  based upon evidence in its possession at the time of this Plea Agreement, or based upon

12  evidence that relates to or arises out of the conduct giving rise to this investigation.

13  Nothing contained in this Agreement is meant to limit the rights and authority of the

14  United States to take further civil or administrative action against OLYMPIC including

15  but not limited to, any listing and debarment proceedings to restrict rights and

16  opportunities of OLYMPIC to contract with or receive assistance, loans, and benefits

17  from United States agencies.

18      This plea agreement does not limit the right of OLYMPIC or the United States to

19  speak at the time of sentencing or in connection with the presentence investigation,

20  consistent with the provisions set forth in this plea agreement, to provide the Court or the

21  United States Probation Office with the full description of OLYMPIC's conduct or facts

22  relating to the events giving rise to this prosecution.  The parties agree that at sentencing

23  they each will support the agreed disposition set forth in this Plea Agreement pursuant to

24  Federal Rule of Criminal Procedure 11(c)(1)(C).

25      11.   <u>Corporate Authorization</u>.  OLYMPIC represents that it is authorized to

26  enter into this settlement.  On or before the date of entry and filing of the Plea Agreement,

27  OLYMPIC shall provide to the United States and the Court:  (1) a true and correct copy

28  of the resolution issued by OLYMPIC's Board of Directors designating a special

PLEA AGREEMENT/OLYMPIC PIPE LINE COMPANY - 11
CR01-338R

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903
(206) 553-7970

1  committee to address all matters relating to resolution of this criminal matter; and (2) a

2  true and correct copy of the resolution passed by such special committee authorizing

3  OLYMPIC to enter into this plea agreement and appear at the Rule 11 hearing and enter

4  pleas on behalf of the company.  OLYMPIC has voluntarily agreed to appear at the guilty

5  plea hearing through an officer or director of the company.

6       12.    Interdependence of Agreements.  This plea agreement shall be conditioned

7  upon the Court's acceptance of the plea agreements entered into by all other defendants in

8  the above-captioned case.  OLYMPIC understands that this Plea Agreement is part of a

9  package plea agreement with the United States, and that if any of the other defendants

10  named in this case do not enter pleas pursuant to their respective agreements reached with

11  the United States, or subsequently withdraw their pleas entered pursuant to these

12  agreements prior to sentencing, the United States will be free to withdraw all plea

13  agreements and will proceed to trial against all defendants for the offense charged in the

14  Indictment.

15       It is also understood that the entry into this Plea Agreement by the parties is

16  conditioned upon the final resolution of the civil action filed by the United States in case

17  number CV02-1178R, United States District Court for the Western District of

18  Washington, and the administrative penalty action filed by the State of Washington, in an

19  administrative penalty matter, Washington Ecology Notice of Penalty No. 02PPRHQ-

20  4039.  The federal civil action shall be resolved by a Consent Decree, and an affiliated

21  program of injunctive relief (referred to as Appendix A).  As part of the resolution of

22  these two actions, the defendant company will pay an additional total penalty of Five

23  Million ($5,000,000) Dollars under the terms and conditions agreed to in those actions.

24  The Consent Decree, and its program of injunctive relief, shall be submitted to the Court

25  for approval pursuant to the customary process for such matters.  The parties agree that if

26  these separate federal and state civil and administrative penalty matters are not resolved

27  by signed agreements no later than close of business, December 20, 2002, each party may

28  withdraw from this Plea Agreement and proceed to trial.  Further, the parties agree that

PLEA AGREEMENT/OLYMPIC PIPE LINE COMPANY - 12
CR01-338R

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903
(206) 553-7970

1 should the Court reject the Consent Decree, or should the Consent Decree otherwise not
2 be entered by the Court and made effective, each party may withdraw from this Plea
3 Agreement and proceed to trial.  Should one of the parties elect to withdraw from this
4 Plea Agreement, the parties shall agree to a reasonable future date for re-calendaring the
5 trial and additional pretrial motions in this matter.

6      13.    <u>Waiver of Appeal</u>.  OLYMPIC is aware that 18 U.S.C. § 3742 gives the
7 right to appeal the sentence to be imposed, and that other federal statutes give a defendant
8 the right to appeal other aspects of the conviction.  In consideration of the agreement of
9 the United States as set forth herein, OLYMPIC knowingly and voluntarily agrees to
10 waive the following rights:

11      a.    The right, conferred by 18 U.S.C. § 3742, to appeal any sentence
12 imposed by the Court for the conviction of these offenses;

13      b.    The right to appeal any aspect of defendant's conviction, including
14 any pre-charge or pre-trial dispositions of motions or other issues; and

15      c.    The right to bring any collateral attack against OLYMPIC's
16 conviction or sentence, except as it may relate to the effectiveness of legal representation.

17      If the Sentencing Court imposes a sentence inconsistent with the terms of the
18 Plea Agreement, and OLYMPIC seeks to withdraw its pleas of guilty and is not permitted
19 to do so, OLYMPIC reserves the right to appeal the denial of its ability to withdraw.

20      14.    <u>Voluntariness of the Plea</u>.  OLYMPIC acknowledges that it has entered into
21 this Plea Agreement freely and voluntarily and that it has been fully advised by counsel,
22 and that no threats or promises were made to induce it to entered into the guilty pleas
23 called for by this Agreement.

24 //
25 //
26 //
27 //
28 ////

PLEA AGREEMENT/OLYMPIC PIPE LINE COMPANY - 13
CR01-338R

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903
(206) 553-7970

1   15.   <u>Completeness of the Agreement</u>   This document is the sole agreement and

2   understanding between OLYMPIC and the United States concerning disposition of the

3   criminal charges in this case.

4          Dated this 11th day of _December_____, 2002.

5

6   FOR THE UNITED STATES:          FOR OLYMPIC PIPE LINE COMPANY:

7

8

   JOHN McKAY                       LAWRENCE B. PECK
9   United States Attorney           Chairman of the Board of Directors
                                     Olympic Pipe Line Company
10

11

12  LAWRENCE LINCOLN                 ANGELO J. CALFO
    Assistant United States Attorney YARMUTH WILSON CALFO PLLC
13                                   DANIELSON HARRIGAN TOLLEFSON LLP
14                                   Attorneys for Olympic Pipe Line Company

15

   FRANCIS J. DISKIN
16  Assistant United States Attorney

17

18

   HELEN J. BRUNNER
19  Assistant United States Attorney

20

21

   JAMES D. OESTERLE
22  Special Assistant United States Attorney

23

24

25

26

27

28

PLEA AGREEMENT/OLYMPIC PIPE LINE COMPANY - 14
CR01-338R